UNITED STATES OF AMERICA,

*Plaintiff,*

v.                                                     Case No. 24-cr-88-BHL-NJ

JAMES MORGAN,

*Defendant.*

## MOTION TO DISMISS

James Morgan, by counsel, moves to dismiss the indictment under Rule 12(b) for failure to state an offense within the charging statute's scope and for constitutional infirmity.[1] He is charged with violating 18 U.S.C. § 229, the chemical weapons statute. Based on that, one might think he possessed something terrible (like a nerve agent) or did something terrible (like detonated a chemical bomb). Not so. He is charged with possessing hydrochloric acid and calcium hypochlorite—chemicals that are legal, widely available, and used for cleaning. Those chemicals sat for months in a storage unit, about twenty miles away from his trailer in Janesville. Nothing about this case speaks to Congress's intent in passing § 229: eradicating the instruments of chemical warfare.

The indictment must be dismissed for three interlocking reasons. First, Morgan's charged conduct is outside the statute's scope. In *Bond*, the Supreme Court applied a limiting construction to § 229, removing from its ambit the "kitchen cupboard" and

---

[1] This motion raises questions of law and so an evidentiary hearing is unnecessary.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

"purely local" activity.[2] The statute doesn't apply to chemicals bearing "little resemblance to the deadly toxins" the International Convention on Chemical Weapons aimed to eliminate, nor does it apply to chemicals that weren't used as instruments of "offensive or defensive combat."[3] Here, Morgan kept household cleaning agents, and he didn't use them like offensive weapons. Thus, his conduct is beyond the statute's reach.

The second reason for dismissal dovetails with the first: applying § 229 to Morgan's purely local activity violates the Tenth Amendment. The Constitution's structural commitment to federalism has denied the government a police power, and federal crimes must be tethered to one of Congress's enumerated powers. Applying § 229 to Morgan's purely local possession of common chemicals violates that principle. Nor is the law authorized by the Necessary and Proper clause; although Congress enacted the statute to implement a treaty, the Treaty Power is subject to "those restraints which are found in [the Constitution] against the action of the government"—including "those arising from the nature of the government itself, and of that of the states."[4]

And third, the charge is void for vagueness. As applied to the mere possession—rather than the use—of common and legal chemicals, § 229's "standard of conduct" is "unintelligible."[5] No person of ordinary intelligence would think that he has violated a law meant to thwart chemical warfare between the nations just because he kept some pool shock in a storage unit. For these reasons, the indictment must be dismissed.

---

[2] *Bond v. United States*, 572 U.S. 844, 856, 866 (2014) (*Bond II*).
[3] *Id.* at 861 (citation omitted).
[4] *De Geofroy v. Riggs*, 133 U.S. 258, 267 (1890).
[5] *Bond II*, 572 U.S. at 873 (Scalia, J., concurring).

# I.     The relevant legal and factual background.

Before discussing the relevant facts and then showing why § 229's ordinary meaning, the Tenth Amendment, and the due process right to fair notice compel the indictment's dismissal, it's helpful to first sketch out the legal lay of the land. That overview begins with Congress enacting the statute in order to implement a chemical weapons treaty. The next stop is the Supreme Court's narrowing of the law to vindicate basic principles of federalism. And last is how Morgan came to be prosecuted under the chemical weapons statute for possessing two bottles of ordinary cleaning agents.

## A.  The implementation of the Convention on Chemical Weapons.

In 1997, President Clinton ratified the Convention on Chemical Weapons.[6] It aimed to eliminate "weapons of mass destruction" and prohibit the "development, stockpiling, or use of chemical weapons" by state and private actors.[7] Although the Geneva Protocol outlawed chemical warfare in 1925, the Convention aimed to modernize its protections following the use of chemical weapons during the Iran-Iraq war (like nerve agents) and in high-profile terrorist attacks (like the Tokyo subway sarin attack).[8] In short, the Convention was an addition to the "instruments of international law" designed to "prohibit weapons deemed particularly abhorrent" to the global community.[9]

---

[6] *Convention on the Prohibition of the Development, Production, Stockpiling, and Use of Chemical Weapons and on Their Destruction*, S. Treaty Doc. No. 103–21, 1974 U.N.T.S. 317.

[7] *Id.*

[8] *Bond II*, 572 U.S. at 849.

[9] Int'l 4 Comm. of the Red Cross Advisory Serv. on Int'l Humanitarian Law, Fact Sheet: 1993 Chemical Weapons Convention (2003), *available at* https://tinyurl.com/bdnzeyhx.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

The Convention required the adoption of laws prohibiting activities that would violate the treaty if undertaken by a signatory state.[10] To that end, Congress passed § 229, the Chemical Weapons Convention Implementation Act.[11] The law makes it unlawful to knowingly "develop, produce, otherwise acquire, transfer directly or indirectly, receive, stockpile, retain, own, possess, or use, or threaten to use, any chemical weapon."[12] It defines "chemical weapon" as a "toxic chemical and its precursors, except where intended for a purpose not prohibited under this chapter as long as the type and quantity is consistent with such a purpose."[13] A toxic chemical, in turn, is defined broadly: "any chemical which through its chemical action on life processes can cause death, temporary incapacitation or permanent harm to humans or animals."[14] Finally, "purposes not prohibited by this chapter" include "[a]ny peaceful purpose related to an industrial, agricultural, research, medical, or pharmaceutical activity or other activity."[15]

On its face, the statute's reach is vast: a person who "use[s]" any "toxic chemical" for a non-"peaceful purpose"—like spiking a drink with bleach—would be guilty of a federal chemical weapons offense and "subject to severe punishment."[16] Under that reading, "hardly a poisoning in the land would fall outside" the law.[17] Put differently, although the States have outlawed poisoning since the Founding,[18] § 229 as written takes

---

[10] Conv. Art. VII.
[11] 112 Stat. 2681–856.
[12] 18 U.S.C. § 229(a)(1).
[13] *Id.* § 229F(1)(A).
[14] *Id.* § 229F(8)(A).
[15] *Id.* § 229F(7).
[16] *Bond II*, 572 U.S. at 851, 856–57.
[17] *Id.* at 863 (citation and quotation marks omitted).
[18] *See* Wayne LeFave, Substantive Criminal Law, § 16.2(b) n.24 (3d ed. 2017).

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

a class of crime that has been traditionally punished at the local level and transmogrifies it into a federal offense—one punishable by "any term of years."[19]

### B. Section 229 doesn't apply to "purely local" activity.

Unsurprisingly, in *Bond* the Supreme Court rejected the government's sweeping reading of § 229. The case's facts are colorful: Bond was a microbiologist who sought revenge after her husband had an affair with her best friend.[20] She obtained an arsenic-based compound, mixed it with potassium dichromate (a chemical she bought on Amazon), and slathered the mixture on her rival's doorknob.[21] Although the chemicals were lethal in high doses, the victim only "suffered a minor chemical burn on her thumb, which she treated by rinsing with water."[22] This "common law assault" violated state law, yet Bond was charged under § 229 for using a "chemical weapon."[23]

Bond conditionally pleaded guilty and appealed the denial of her motion to dismiss, arguing that the Tenth Amendment barred her conviction.[24] The Supreme Court reversed the Third Circuit's holding that she lacked standing, explaining that a person may "assert injury from governmental action taken in excess of the authority that federalism defines."[25] On remand, Bond renewed her constitutional claim and also

---

[19] 18 U.S.C. § 229A(a)(1).
[20] *Bond* II, 572 U.S. at 852.
[21] *Id.*
[22] *Id.*
[23] *Id.* at 852–53, 856.
[24] *United States v. Bond*, 581 F.3d 128 (3d Cir. 2009).
[25] *Bond v. United States*, 564 U.S. 211, 220 (2011) (*Bond I*).

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

argued that because § 229 targeted "warlike" activities, her conduct was outside the statute's scope.[26] Both claims failed, and Bond returned to the Supreme Court.

The Supreme Court held that Bond's assault was outside of § 229's reach. It first observed that, as a matter of "basic principles of federalism," federal crimes are construed not to "dramatically intrude upon traditional state criminal jurisdiction," absent a "clear indication that they do."[27] Thus, when a federal law upsets the "usual constitutional balance of federal and state powers," Congress's intent to do so must be "reasonably explicit."[28] That canon of construction applies to federal laws touching on "areas of traditional state responsibility," and the "clearest example of traditional state authority is the punishment of local criminal activity."[29] Applying that limiting principle to § 229, the *Bond* Court explained that any "expansive" interpretation of the law's "key" term — "chemical weapon" — that "intrude[d] on the police power of the States" required a "clear indication that Congress meant to reach purely local crimes."[30] The Supreme Court held that there was no "such clear indication in section 229" evincing Congress's intent for the law to reach local conduct, and it gave four reasons for that conclusion.[31]

*First*, looking at the "natural meaning" of the key term, no "educated user of English" would describe Bond's petty assault "as involving a 'chemical weapon.'"[32] Put differently, "[s]aying that a person 'used a chemical weapon' conveys a very different

---

[26] *Bond II*, 572 U.S. at 853.
[27] *Id.* at 857–59 (cleaned up).
[28] *Id.* at 858 (citation and quotation marks omitted).
[29] *Id.*
[30] *Id.* at 860.
[31] *Id.*
[32] *Id.*

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

idea than saying the person 'used a chemical in a way that caused some harm.'"[33] Thus, the *Bond* Court provided a two-part test to ascertain the "natural meaning of 'chemical weapon,'" which considers: (1) "the particular chemicals that the defendant used"; and (2) "the circumstances in which she used them."[34]

*Second*, applying that two-part test to Bond's case, her conduct was outside of § 229's reach. As to the chemicals that she had used, they bore "little resemblance to the deadly toxins" (like nerve agents) that the Convention sought to stamp out.[35] As to the circumstances of their use, using something as a "weapon" connotes an "instrument of offensive or defensive combat"—and no reasonable person would describe smearing irritants on a doorknob and causing a "minor thumb burn" as "combat."[36]

*Third*, the Supreme Court explained that applying § 229 to every non-peaceful use of toxic chemicals would upend the "sensitive" federal-state relationship by "convert[ing] an astonishing amount of traditionally local criminal conduct into a matter for federal enforcement."[37] The government's reading of the law "would sweep in everything from the detergent under the kitchen sink to the stain remover in the laundry room," the *Bond* Court explained, even though "no one would ordinarily describe those" household cleaning products "as 'chemical weapons.'"[38] That, in turn, "would transform

---

[33] *Id.*
[34] *Id.* at 861.
[35] *Id.*
[36] *Id.* (citation omitted).
[37] *Id.* at 863 (citation and quotation marks omitted).
[38] *Id.* at 862.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

the statute from one whose core concerns are acts of war, assassination, and terrorism into a massive federal anti-poisoning regime that reaches the simplest of assaults."[39]

*Fourth* and finally, the Supreme Court observed that the "handful" of prosecutions under § 229 have not involved "purely local crimes," but rather "terrorist plots or the possession of extremely dangerous substances with the potential to cause severe harm to many people."[40] The *Bond* Court gave several examples, such as an attempt to acquire "VX nerve gas" as part of "a plot to attack a federal courthouse,"[41] and the detonation of a "chlorine bomb" inside a residential neighborhood.[42] The Supreme Court stressed that the government "has a substantial interest in enforcing criminal laws against assassination, terrorism, and acts with the potential to cause mass suffering."[43] Conversely, state law was more than "sufficient to prosecute Bond"—her conduct was sanctionable under Pennsylvania law as simple assault, reckless endangerment, and harassment.[44] And that weighed against a "sweeping reading of the statute" that would "fundamentally upset the Constitution's balance between national and local power."[45]

In sum, if anything is clear after *Bond*, it's this: § 229 doesn't "reach into the kitchen cupboard."[46] To allow the statute to address such local conduct untethered from a federal

---

[39] *Id.* at 863.
[40] *Id.*
[41] *Id.* at 863–64 (citing *United States v. Crocker*, 260 F. App'x 794 (6th Cir. 2008)).
[42] *Id.* at 864 (citing *United States v. Fries*, No. CR–11–1751, 2012 WL 689157 (D. Ariz. Feb. 28, 2012)).
[43] *Id.*
[44] *Id.*
[45] *Id.* at 866.
[46] *Id.*

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

interest would violate the "constitutional structure," as well as the allocation of "criminal law enforcement authority" between the government and the states.[47]

## C. The government charges Morgan with a chemicals weapon offense for possessing minor quantities of common cleaning agents.

With those legal principles nailed down, what follows is how James Morgan ended up in federal court for possessing two bottles of household cleaning agents. In 2019, he moved to Janesville, Wisconsin, to take care of his ailing father who was suffering from lung cancer.[48] That same year, he enrolled at the University of Wisconsin in Whitewater to major in chemistry.[49] In June 2022, he moved to an apartment in Whitewater to be closer to the university.[50] A few months later, he lost his longtime assembly line job at Generac (due to mass layoffs) and paused his studies for financial reasons.[51] In July 2023, he vacated his apartment and moved his belongings into a travel trailer, which he parked outside of the Janesville McDonald's where he had found work.[52]

There are three things about Morgan that stand out and are relevant to this motion. First, he has strong anti-government and anti-left-wing views.[53] For example, he posted that "governments should be afraid of their people;" he discussed forming a militia to defend "God given freedoms" and oppose government "control"; and he was convinced that groups like Antifa were a threat to his life.[54] Those views had "accelerat[ed]" after he

---

[47] *Id.*
[48] *Bates* 998, 1068.
[49] *Bates* 998, 1069.
[50] *Bates* 1069.
[51] *Bates* 1069.
[52] *Bates* 1069, 1086–87.
[53] *Bates* 808, 961, 2031, 2038, 2542.
[54] *Bates* 1068, 1071, 1075, 3430.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

moved in with his father, who shared them.[55] Morgan also routinely expressed bigoted

views directed at racial minorities, Jews, and undocumented immigrants.[56] But he has

never acted on those views—in the thousands of pages of discovery provided in this case,

there is no indication that he has ever harmed anyone because of their race, religion,

political views, or affiliation with the government or law enforcement. Nor has he formed

a militia or actually done anything to oppose government control. Put more pointedly,

nothing indicates that Morgan is anything other than an online blowhard.

Second, Morgan has long been interested in weapons: he owned numerous

firearms and posted pictures of them online.[57] Notably, his gun collection was legal, given

his lack of prior felony convictions. He also has an interest in making weapons. For

example, in 2019 he posted a video showing how to make a smoke grenade.[58] That same

year, he made a video about a device that sprays sulfuric acid.[59] And in 2021, he posted

about making "affordable artillery" for the "common man."[60] Yet Morgan has never used

his firearms or homemade devices to hurt anyone; rather, he has consistently told law

enforcement and acquaintances that he kept them for self-defense.[61]

And third, Morgan often talked about chemicals and their uses. For example, in

2020 he made a video showing bottles of hydrochloric acid and calcium hypochlorite,

---

[55] *Bates* 2035.
[56] *Bates* 1085.
[57] *Bates* 1079–81.
[58] *Bates* 1071.
[59] *Bates* 1075.
[60] *Bates* 1082.
[61] *Bates* 751, 867, 995, 2543.

stating they could make "a lot of chlorine very quickly."[62] And in 2023, he wrote the same in a text, noting that chlorine gas "can be very effective if your enemy isn't ready."[63]

Morgan's online activities got law enforcement's attention. Beginning in 2019, state authorities investigated him over the acid sprayer.[64] Nothing came of that: in a November 2019 report, the police noted that although he "has strong political views, he does not make specific threats. In general, most of his posts are non-violent in nature."[65] That was echoed by a March 2020 statewide bulletin, which concluded that he did not present "an imminent, specific threat."[66] And in May 2020, the FBI concluded that he posed no "threat to life" and didn't "warrant further investigation."[67]

In July 2022, the FBI reopened the case after being recontacted by state police about Morgan's online posts.[68] Once again, the FBI assessed that he posed no "threat to life," but nevertheless launched a full-blown investigation.[69] In December 2023, the FBI applied for a warrant to search his trailer in Janesville and his storage unit in Whitewater.[70] The warrant application mainly relied on things the FBI had known since 2019, such as the smoke grenade, the acid sprayer, and his anti-government posts.[71] The affidavit also cited an online private message Morgan sent to his girlfriend in May 2023, where he wrote that

---

[62] *Bates* 1072.
[63] *Bates* 1169.
[64] *Bates* 1071–72.
[65] *United States v. Morgan*, No. 24-cr-006-jdp, dkt. no. 23-6 at 5 (W.D. Wis).
[66] *Id.*, dkt. no. 23-7 at 1.
[67] *Bates* 2695.
[68] *Bates* 12.
[69] *Bates* 11.
[70] *Bates* 1057, 1088.
[71] *Bates* 1070–71, 1075–77.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

if the "goobermint" ever came "for the guns," he would use hydrochloric acid and calcium hypochlorite to create a large amount of chlorine and "defeat them without firing a shot."[72] The warrant issued, and the FBI executed it on December 21, 2023.[73]

In executing the warrant, the agents detained Morgan at the McDonald's where he worked (again, his trailer was parked outside).[74] He fully cooperated, handing them the keys to his truck, trailer, and a safe.[75] Even after he was formally arrested, the agents left him unhandcuffed.[76] Inside the trailer, the FBI found his firearms—which he later voluntarily surrendered—and six explosives in cardboard tubes.[77] He was charged in the Western District of Wisconsin for possessing unregistered destructive devices.[78]

Meanwhile, inside Morgan's storage unit located about twenty miles away in Whitewater, the FBI found chemicals and chemistry equipment.[79] Specifically, the agents found inside a dresser drawer a one-kilogram bottle of hydrochloric acid:[80]

---

[72] *Bates* 1074–75.
[73] *Bates* 1052–53, 1066.
[74] *Bates* 994.
[75] *Bates* 994–95.
[76] *Bates* 996.
[77] *Bates* 998, 1018, 1049–1050.
[78] *See United States v. Morgan*, 24-cr-6-jdp, dkt. no. 10 (W.D.) (indictment).
[79] *Bates* 996, 1053.
[80] *Bates* 1053, 1131, 1228.





FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

In a different drawer, they found a half-kilogram bottle of calcium hypochlorite:[81]





---

[81] *Bates* 1053, 1131, 1228.

Both chemicals found in Morgan's storage unit are legal and readily obtainable common cleaning products. Hydrochloric acid is made up of hydrogen and chlorine. It's sold at brick-and-mortar stores like Walmart, and available through online vendors like Amazon. It can be used as a household surface cleaner, a disinfectant, and to sanitize pools.[82] And beyond its uses as a cleaner, it has industrial uses too numerous to list.[83] Morgan told the FBI that he had purchased the hydrochloric acid from Amazon and kept it because it was "versatile for making other chemicals and could be used in case an experiment called for a chemical he did not have."[84] As to the calcium hypochlorite, it's a chemical compound consisting mostly of chlorine. It too is readily available online and at hardware stores, it can be used as a surface cleaner or a bleach, and it's most commonly marketed as pool shock.[85] Morgan told the FBI that he possessed the chemical because it was "a good source of ions for experiments."[86]

Morgan had possessed the chemicals for some time. In March 2020, he took a picture of them:[87]

---

[82] *See, e.g.,* American Chemistry Council, *Chemical Safety Facts: Hydrochloric Acid* (Oct. 14, 2022) (*available at* https://www.chemicalsafetyfacts.org/chemicals/hydrochloric-acid).

[83] *See id.*

[84] *Bates* 996.

[85] Nat'l Ctr. For Biotechnology Information—PubChem, *Calcium Hypochlorite Compound Summary* (*available at* https://pubchem.ncbi.nlm.nih.gov/compound/Calcium-hypochlorite); *Bates* 996.

[86] *Bates* 996.

[87] *Bates* 3539.



Then, in October 2021, he took another picture of them:[88]



[88] *Bates* 3539.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

As pages 13–14 of this brief show, those bottles are the same as the ones found during the December 2023 search of his storage unit. Morgan had rented that unit since late 2022, and he had vacated his Whitewater apartment in July 2023.[89] Thus, the chemicals had been in the storage unit for at least several months, if not over a year.

Morgan was indicted for knowingly retaining, owning, and possessing a chemical weapon, namely "precursors": calcium hypochlorite and hydrochloric acid.[90] In short, those two aging bottles of legal cleaning agents—kept in a storage unit in a different city—are the sole basis for charging him under § 229, a statute implementing a treaty between the nations designed to curb the instruments of chemical warfare.[91]

## II. Under *Bond*, Morgan's charged conduct falls outside of § 229's scope.

Morgan didn't violate a law meant to stamp out chemical warfare by possessing common household cleaning agents. Again, *Bond* calls for a two-part test to determine the ordinary meaning of "chemical weapon," and whether the charged conduct falls within § 229's definition of a federal chemical weapons offense. The Court must first look to "the type of chemicals in the case."[92] And it must then consider "the circumstances in which the defendant used them."[93] If the chemicals at issue "are not of the sort that an ordinary person would associate with instruments of chemical warfare," and if "no speaker in natural parlance would describe" the defendant's use of them as "combat,"

---

[89] *Bates* 1086–88.
[90] R.1 (indictment).
[91] *Id.*
[92] *United States v. Le*, 902 F.3d 104, 114 (2d Cir. 2018); *accord United States v. Kimber*, 777 F.3d 553, 560-61 (2d. Cir. 2015) (same); *United States v. Levenderis*, 806 F.3d 390, 397 (6th Cir. 2015) (same).
[93] *Le*, 902 F.3d at 114.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

then § 229 simply doesn't apply.[94] That's the case here: both *Bond*'s limiting construction of the term "chemical weapon" and fundamental principles of federalism show that Morgan's possessory and "purely local" activity is outside the statute's reach.[95]

First, as to the type of chemicals in Morgan's storage unit, no ordinary person would describe them as implements of chemical warfare.[96] He didn't have "extremely dangerous substances with the potential to cause severe harm to many people."[97] This case doesn't involve VX, an extremely deadly nerve agent.[98] It doesn't involve liquid mercury, a neurotoxin that can "cause death, brain and nervous system damage, and other serious bodily injuries."[99] And it doesn't involve the possession of enough potassium cyanide to kill 450 people.[100] Rather, this case turns on two bottles of hydrochloric acid and calcium hypochlorite—common household cleaning agents.

As noted, hydrochloric acid is used to clean concrete and masonry, and calcium hypochlorite is used to clean pools. They are legal and available at any hardware store. One could purchase either substance "on Amazon.com" in just a few clicks.[101] Thus, these cleaning agents are just like "the detergent under the kitchen sink" or "the stain remover in the laundry room"—and "no one would ordinarily describe those substances as

---

[94] *Bond II*, 572 U.S. at 861.

[95] *See id.* at 860.

[96] *See id.* at 860–61.

[97] *See id.* at 863.

[98] *See id.* at 863–64 (citing *United States v. Crocker*, 260 F. App'x 794 (6th Cir. 2008)).

[99] *See United States v. Kimber*, 777 F.3d 553, 557 (2d Cir. 2015).

[100] *See United States v. Ghane*, 673 F.3d 771, 776 n.3 (8th Cir. 2012).

[101] *See Bond II*, 572 U.S. at 852.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

18

'chemical weapons.'"[102] To hold otherwise would, in *Bond*'s words, turn countless "cleaning cabinet[s] in America into a potential chemical weapons cache."[103]

Second, as to the "circumstances in which [Morgan] used" the chemicals, he didn't use them in any way, let alone as an "instrument of offensive or defensive combat."[104] Unlike the *Bond* defendant, he didn't expose anyone to the chemicals, he didn't spread them in public, and he didn't otherwise try to inflict harm with them. In a word, he didn't use them as "instruments of chemical warfare."[105] Rather, he kept them in a locked storage unit in another city where they sat uneventfully for months, if not longer. Given that the *Bond* defendant's use of exotic and "potentially lethal" substances to inflict a chemical burn nevertheless fell outside of § 229's scope, Morgan's constructive possession of common cleaning agents cannot conceivably be within a statute Congress enacted to prevent atrocities like the Tokyo subway sarin attack. In the Supreme Court's words, "there are no apparent interests of the United States Congress or the community of nations" in prosecuting Morgan because he kept pool shock in a drawer.[106]

Compare Morgan's case to situations where people actually used toxins like instruments of chemical warfare. In *Kimber*, the defendant repeatedly spread pounds of deadly mercury throughout a hospital in order to cause "panic," forcing the emergency room to close.[107] In one attack, he placed mercury under cafeteria heat lamps, greatly

---

[102] *Id.* at 862.
[103] *See id.* at 853 (citation omitted).
[104] *See id.* at 861 (citation omitted).
[105] *See id.*
[106] *See id.* at 865.
[107] 777 F.3d at 556.

increasing the chances that the neurotoxin would vaporize and be inhaled.[108] Likewise, in *Fries*, the defendant detonated a "chlorine bomb" in a residential neighborhood, producing a "1,000 foot long" gas cloud that "injured several people" and "required the evacuation" of the neighborhood.[109] Because using chlorine gas like that had the "potential to cause mass suffering," such conduct was plainly within § 229's scope.[110] Those examples satisfy the statute because they are "quintessential terrorism," rather than "purely local" conduct.[111] Or, in *Bond*'s parlance, an ordinary person would understand that using a toxic chemical to attack a hospital or a neighborhood amounts to using "a chemical weapon."[112] Here, no "educated user of English" would say the same about the long-term storage of two bottles of common and legal cleaning agents.[113]

The government's response will likely be twofold. First, it'll argue that combining these precursor chemicals makes chlorine gas (a chemical "dangerous to life and health"), and so they're not akin to "the detergent under the kitchen sink."[114] But that logic applies to many cleaning products. There's a reason why people are drilled from an early age not to mix them; for example, combining bleach and ammonia makes a toxic gas called chloramine.[115] Yet the fact that it's widely known that cleaning products can combine into something more dangerous doesn't permit the government, through § 229, "to reach into

---

[108] *Id.* at 557.
[109] *United States v. Fries*, 781 F.3d 1137, 1149 (9th Cir. 2015).
[110] *Id.* (quoting *Bond II*, 572 U.S. at 864).
[111] *Kimber*, 777 F.3d at 561–62.
[112] *See Bond II*, 572 U.S. at 860–61.
[113] *See id.* at 860.
[114] *Fries*, 781 F.3d at 1149 (first quote); *Bond II*, 572 U.S. at 862 (second and third quotes).
[115] *See, e.g.,* Washington State Dep't of Health, *Dangers of Mixing Bleach with Cleaners* (*available at* https://doh.wa.gov/community-and-environment/contaminants/bleach-mixing-dangers).

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

the kitchen cupboard."[116] To be clear, chlorine "may serve as a chemical weapon when used to make a chlorine bomb," but Morgan didn't use, make, or plan to make a chlorine bomb.[117] Rather, this prosecution rests on "common household substances"—precisely the kind of chemicals that the *Bond* Court held are outside of § 229's reach.[118]

Second, the government will rely on what Morgan wrote about chlorine gas. Again, in a March 2020 video, he said that the chemicals could be used to make "a lot of chlorine very quickly"; in a January 2023 text, Morgan wrote that chlorine gas could "be effective if your enemy isn't ready for it";[119] and in May 2023 messages to his girlfriend, he wrote that he would use chlorine gas if the "goobermint" ever came "for the guns."[120] Those words do not convert the possession of legal cleaning agents into a federal chemical weapons case, and they cannot be divorced from their context. Morgan kept his (legally-owned) firearms in his Janesville trailer, while the chemicals were languishing in his Whitewater storage unit about twenty miles away. If the "goobermint" had ever come for the guns, it would've been physically impossible for him to use the chemicals in an offensive capacity.[121] Put simply, the notion that he planned to use the chemicals as weapons to defend his guns is belied by the fact that they weren't at arm's reach.

It would obviously be a different story if Morgan was planning a chlorine gas attack. For example, the *Sandomire* Court concluded that the possession of precursors to

---

[116] *Bond II*, 572 U.S. at 866.
[117] *See Kimber*, 777 F.3d at 561.
[118] *Bond II*, 572 U.S. at 862 (citation omitted).
[119] *Bates* 1169.
[120] *Bates* 750.
[121] *Bates* 750.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

chlorine gas was within § 229 because the defendant had planned to release the gas into a "large residential apartment building."[122] Notably, that defendant had obtained the building's floor plan, he had a folder in his computer labeled "my attack plan," and he had created a computer file entitled "destroy [the building]."[123] Here, there's not an iota of proof that Morgan planned to carry out an attack, let alone had committed any overt acts in furtherance of his (non-existent) plan. Indeed, in the parallel Western District prosecution, Magistrate Judge Crocker concluded that the search warrant's allegations—which included the chlorine gas messages—failed to establish even "by a preponderance of the evidence" that Morgan intended to commit domestic terrorism.[124] And because he didn't intend to "cause mass suffering," there's simply no "substantial interest" in federally prosecuting him for possessing two bottles of cleaning fluids.[125]

In sum, because Morgan didn't use or plan to use the household cleaners in his storage unit as instruments of chemical warfare, his "purely local" possession of them isn't a federal concern—and it falls outside of § 229's scope. Because the government has stretched the statute past its breaking point, fundamental principles of federalism and *Bond*'s limiting construction together require the indictment's dismissal.

---

[122] *United States v. Sandomire*, CR. No. 20-00085 JMS, 2021 WL 217876, at *7 (D. Haw. 2021).

[123] *See id.*, dkt. no. 38 ¶¶ 35–41 (indictment).

[124] *United States v. Morgan*, 24-cr-6-jdp, dkt. no. 46 at 31 (W.D. Wis.) (Report & Recommendation).

[125] *See Bond II*, 572 U.S. at 864.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

### III. Section 229 as applied to Morgan exceeds Congress's enumerated powers, and it invades powers the Constitution's structure reserves to the States.

Applying the ordinary meaning of "chemical weapons" to the constructive possession of common cleaning agents by itself dooms the indictment, yet there's a related reason why dismissal is necessary: § 229 amounts to an exercise of the police power and exceeds Article I's enumerated powers. In *Bond*, the government argued that Congress was authorized to enact § 229 because it was "a necessary and proper means of executing the National Government's power to make treaties," and the defense anticipates a similar argument here.[126] But the Supreme Court has long recognized that the Treaty Power is subject to "those restraints which are found in [the Constitution] against the action of the government"—including "those arising from the nature of the government itself, and of that of the states."[127] Because § 229 runs afoul of the Constitution's division of sovereignty, the indictment violates the Tenth Amendment.

#### A. The police power to regulate local conduct belongs to the States.

It has been "clear" for over two centuries that "Congress cannot punish felonies generally."[128] That's because the Constitution withholds from Congress a "plenary police power that would authorize enactment of every type of legislation."[129] Under federalism, the States are the repository of the police power—a "broad authority to enact legislation for the public good."[130] Thus, a crime committed "wholly within a State 'cannot be made

---

[126] *Bond II*, 572 U.S. at 855; *see also* U.S. Const., Art. II, § 2, cl. 2.
[127] *Geofroy*, 133 U.S. at 267.
[128] *Cohens v. Virginia*, 6 Wheat. 264, 428, 5 L.Ed. 257 (1821).
[129] *United States v. Lopez*, 514 U.S. 549, 566 (1995); *accord United States v. Morrison*, 529 U.S. 598, 618 n.8 (2000).
[130] *Bond II*, 572 U.S. at 854 (citing *Lopez*, 514 U.S. at 567).

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

Case 2:24-cr-00088-BHL    Filed 07/19/24    Page 23 of 36    Document 12

an offence against the United States, unless it have some relation to the execution of a power of Congress, or to some matter within the jurisdiction of the United States.'"[131] This division of power is a crucial guardrail built into Article I: in denying the government "complete jurisdiction over all the concerns of public life," federalism's allocation of the police power protects individual liberty "from arbitrary power."[132]

There's "no better example of the police power" than the suppression of crime; the States possess the "primary authority for defining and enforcing the criminal law."[133] Congress can (of course) enact criminal laws, but it may intrude upon the States' traditional criminal realm only when it targets conduct that implicates matters of national or international, rather than local, concern. In Justice Kennedy's words, were the government "to take over the regulation of entire areas of traditional state concern," then "the boundaries between the spheres of federal and state authority would blur and political responsibility would become illusory."[134] Thus, the Supreme Court has consistently required federal crimes to have a nexus to a federal concern and one of Congress's enumerated powers.[135] To underscore the point with an uncontroversial example: a federal statute criminalizing all murders within the United States would plainly exceed Article I, given Congress's lack of an enumerated police power.

---

[131] *Id.* (quoting *United States v. Fox*, 95 U.S. 670, 672 (1877)).

[132] *Bond I*, 564 U.S. at 222.

[133] *Morrison*, 529 U.S. at 618 (first quote); *Brecht v. Abrahamson*, 507 U.S. 619, 635 (1992) (second quote).

[134] *Lopez*, 514 U.S. at 577 (Kennedy, J., concurring).

[135] *See United States v. Bass*, 404 U.S. 336, 350 (1971) (construing federal firearms statute not to reach every possession of a firearm); *Jones v. United States*, 529 U.S. 848, 855 (2000) (construing federal arson statute not to reach every building).

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

Section 229 is a quintessential example of the police power. It's not limited to "acts of war, assassination, and terrorism," but instead encompasses every instance where a toxic chemical is used or possessed for a non-peaceful purpose.[136] As applied to Morgan's constructive possession of household cleaning chemicals, it "intrudes on the police power of the States" by criminalizing "purely local" conduct.[137] He did not "place[] many people at risk of serious harm"; he did not engage in conduct that "could affect entire regions of [Wisconsin] and neighboring states"; and he did not commit an act "with the potential to cause mass suffering."[138] He had two bottles of cleaning chemicals in a drawer. Because the lack of a federal police power forbids the government from reaching into the cleaning cupboard, applying § 229 to Morgan is "contrary to the Framers' careful decision to divide power between the States and the National Government as a means of preserving liberty," in violation of the Tenth Amendment's command.[139]

**B. The Treaty Power does not remove all limits on federal authority.**

The government cannot contest the above recitation of federalism's operation or Congress's lack of a generalized police power. Instead, the defense anticipates it will justify § 229's constitutionality with the following syllogism:

- The President and the Senate have the power to make treaties;[140]

- Under the Necessary and Proper Clause, Congress can enact legislation to implement and enforce treaties;[141]

---

[136] *See Bond II*, 572 U.S. at 863.

[137] *See id.* at 860.

[138] *See Kimber*, 777 F.3d at 561 (first and second quotes); *Fries*, 781 F.3d at 1149 (citation omitted) (third quote).

[139] *See Bond II*, 572 U.S. at 855 (summarizing the petitioner's constitutional claim).

[140] U.S. Const., Art. II, § 2, cl. 2.

[141] U.S. Const., Art. I, § 8, cl. 18.

- Section 229 validly implements the Chemical Weapons Convention.

Any reliance on the Treaty Power to defend § 229's enactment fails because "no agreement with a foreign nation can confer power on the Congress, or on any other branch of Government, which is free from the restraints of the Constitution."[142] Nothing in the text of the Treaty Power, the Supremacy Clause, or any other provision or Article I "intimates that treaties and laws enacted pursuant to them do not have to comply with the provisions of the Constitution."[143] Quite the opposite: the Constitution's constraints "were designed to apply to all branches of the National Government and they cannot be nullified by the Executive or by the Executive and the Senate combined."[144]

Indeed, the Supreme Court has recognized for almost two centuries that treaties do not supersede the Constitution's demands. When first confronted in 1836 with whether a treaty may grant Congress power it otherwise lacks, the Court rejected the notion that federal power can "be enlarged under the treaty-making power."[145] The Court has since reiterated the point: like all other federal powers, the Treaty Power is subject to "those restraints which are found in [the Constitution] against the action of the government," including "those arising from the nature of the government itself, and of that of the states."[146] Put somewhat differently, the Treaty Power must be exercised consistently "with the nature of our government and the relation between the States and

---

[142] *Reid v. Covert*, 354 U.S. 1, 16 (1957) (plurality opinion).
[143] *Id.*
[144] *Id.* at 17.
[145] *City of New Orleans v. United States*, 35 U.S. 662, 736 (1836).
[146] *Geofroy*, 133 U.S. at 267.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

the United States."[147] In short and to reiterate, no treaty "can confer power on the Congress" that "is free from the restraints of the Constitution."[148]

That makes sense: it would upend federalism if the government could circumvent constitutional limitations by simply enacting a treaty. Return for a moment to the hypothetical federal national-murder statute, which would clearly be invalid under Article I. But what if the government ratified a human rights treaty mandating the protection of life? What would stop Congress from imposing on the States laws designed to enforce and remedy violations of commands the Constitution does not contain? Indeed, proponents of a sweeping Treaty Power see it as a vehicle to reenact federal laws the Supreme Court previously struck down for exceeding Congress's enumerated authority.[149] This Court should reject the notion that the Treaty Power is a blueprint for circumventing every limitation on federal authority built into the Constitution.

In sum, the federal government cannot criminalize anything and everything just because it first ratified a treaty; the Treaty Power does not grant Congress the police power the Constitution intentionally withheld. Such a sweeping conception of a limitless federal power is alien to fundamental principles of federalism and state sovereignty. And it would violate the axiom that the federal government's powers "are few and defined," while those of the States "are numerous and indefinite."[150]

---

[147] *Holden v. Joy*, 84 U.S. 211, 243 (1873).
[148] *Boos v. Barry*, 485 U.S. 312, 324 (1988).
[149] *See* Nicholas Quinn Rosenkranz, *Executing the Treaty Power*, 118 Harv. L. Rev. 1867, 1871–73 & nn.19–25 (2005).
[150] The Federalist No. 45, at 313 (James Madison) (Jacob E. Cooke ed., 1961).

**C. The Supreme Court's decision in *Missouri v. Holland* did not eliminate federalism as a constraint on the Treaty Power.**

The government will likely concede that the affirmative prohibitions of the Bill of Rights constrain the Treaty Power, but it will argue that the Supreme Court's decision in *Missouri v. Holland* compels a different result as to the Constitution's structural provisions.[151] That's the position it took in *Bond II*.[152] In plain English, the argument goes like this: so long as Congress doesn't violate the first eight amendments, it otherwise has free rein when implementing a treaty. That theory can be reconciled with neither the Supreme Court's pre-*Holland* cases, nor with *Holland* itself. It likewise cannot be squared with the Constitution's textual and structural commitment to federalism.

*Holland* involved a challenge to the Migratory Bird Treaty Act of 1918, a statute implementing a treaty between the United States and Great Britain. Missouri challenged the Act on its face, arguing that the law worked "an unconstitutional interference with the rights reserved to the States by the Tenth Amendment," as well as with the State's pecuniary interest in birds within its borders.[153] Missouri primarily contended that the treaty was invalid, and also maintained that the legislation fell along with the invalid treaty. In rejecting that challenge, the Supreme Court likewise focused almost exclusively on the treaty's validity. It addressed the statute only as an afterthought: "If the treaty is valid there can be no dispute about the validity of the statute under Article I, Section 8,

---

[151] *See Missouri v. Holland*, 252 U.S. 416 (1920).

[152] *See* Brief for the United States, *Bond v. United States*, 572 U.S. 844 (2014) (No. 12-158), 2013 WL 4407059, at \*45-46.

[153] *Holland*, 252 U.S. at 431.

as a necessary and proper means to execute the powers of the Government."[154] That isolated line is what the government will likely hang its hat on.

The government has read that single sentence as establishing a definitive rule: any legislation rationally implementing a valid treaty is a valid exercise of the Necessary and Proper Clause. That self-serving reading of *Holland* (which conveniently gives the government backdoor access to the police power) upends federalism and cannot be squared with the balance of the opinion. When the Supreme Court turned to the predicate question of whether "the treaty is valid," it wrote that the treaty did "not contravene any prohibitory words to be found in the Constitution," but nevertheless went on to consider whether the treaty was "forbidden by some invisible radiation from the general terms of the Tenth Amendment."[155] The *Holland* Court didn't answer that question with a categorical "no." Rather, it balanced the national and state interests, and it concluded that the former interest trumped what it viewed as a de minimis State interest.[156] Of course, that entire analysis would have been unnecessary if federalism principles were irrelevant when the Congress legislates pursuant to the Treaty Power.

Thus, *Holland* is in harmony with the principle that Congress's legislative authority requires a nexus to a matter of national or international importance. Nothing in the decision suggests, let alone compels, that a statute prohibiting the taking of *any* bird—whether migratory or not—would likewise be constitutional. Yet a treaty

---

[154] *Id.* at 432.

[155] *Id.* at 433–34.

[156] *Id.* at 435.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

addressing only migratory birds would be no less valid if implemented through such overinclusive legislation. To be sure, the *Holland* Court focused on the treaty's validity, rather than the implementing legislation, but that just mirrored Missouri's litigation strategy—which in turn reflected the clear nexus between the treaty and the legislation. By focusing on *migratory* birds, the implementing legislation essentially provided its own jurisdictional element. But it doesn't follow that any law implementing a valid treaty is equally valid, even if it reflects a blatant "disregard of the federal structure of our Government."[157] Put simply, the *Holland* Court never confronted *that* question.

Finally, the government's broad reading of the case is inconsistent with the *Holland* Court's assurance that it was merely applying "established rules to the present case."[158] Critically, the Court did not purport to overturn earlier decisions holding that the treaty power is subject to those restraints "arising from the nature of the government itself, and of that of the states."[159] The notion that the Supreme Court silently overruled cases like *Geofroy* and created a latent police power (where Congress's plenary powers are relentlessly expanded with each additional treaty) is, in a word, implausible; there is a "presumption that the Supreme Court does not overrule itself sub silentio."[160]

---

[157] *Bond I*, 564 U.S. at 225–26.
[158] *Holland*, 252 U.S. at 435.
[159] *Geofroy*, 133 U.S. at 267.
[160] *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 149 (2d Cir. 2012) (citing *Hohn v. United States*, 524 U.S. 236, 252–53 (1998)); *accord Shalala v. Ill. Council on Long Term Care*, 529 U.S. 1, 18 (2000).

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

### D. The Commerce Clause doesn't authorize § 229.

Anticipating another counterargument, any attempt to salvage the indictment by invoking the Commerce Clause fails because § 229 has nothing to do with foreign or interstate commerce. Although the government often justifies federal criminal laws by invoking its power to regulate commerce,[161] it has previously "disavowed that argument" in defending Congress's power to enact § 229.[162] That disavowal was prudent: in crafting § 229, Congress didn't rely on its Commerce Clause authority in either the legislation or the accompanying report.[163] And it didn't find that the regulation of chemical weapons has a substantial effect on commerce. Thus, there isn't a shred of proof that Congress was exercising its Commerce Clause authority when it passed § 229, and this Court shouldn't rely on a justification that Congress declined to invoke.

To be sure, "Congress normally is not required to make formal findings as to the substantial burdens an activity has on interstate commerce."[164] But formal findings permit courts "to evaluate the legislative judgment that the activity in question substantially affected" commerce.[165] The absence of a clear invocation is especially revealing here, given that the alleged § 229 violation is that Morgan "retained, owned, and possessed" his household cleaning agents—*not* that he "acquired" or "received"

---

[161] *See, e.g., Scarborough v. United States*, 431 U.S. 563 (1977).

[162] *Bond II*, 572 U.S. at 854–55; *see also United States v. Bond*, No. 07–cr–528, dkt. no. 30 at 7 (E.D. Pa.) (conceding that § 229 "was not enacted under the interstate commerce authority but under Congress's authority to implement treaties.").

[163] *See* H.R. Rep. No. 105-825 (1998) (Conf. Rep.).

[164] *Lopez*, 514 U.S. at 562.

[165] *Id.* at 563.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

them through the channels of interstate commerce.[166] Likewise, the indictment's jurisdictional allegation is that he possessed those chemicals within Wisconsin.[167] Notably, § 229 doesn't require the government to prove that the chemicals Morgan possessed travelled in interstate or foreign commerce. Indeed, § 229's jurisdictional scope is indifferent not only to the borders of the States but also to those of foreign countries: the law extends jurisdiction to any offense committed in the United States, and to any offense committed by or against a U.S. national outside the country and anywhere on Earth.[168] At risk of understatement, prosecuting a foreign national for attacking a U.S. citizen in a foreign country with a chemical has nothing to do with commerce.

That indifference to the States' borders is such an incursion on the federal division of powers and State sovereignty that the Court should be persuaded that Congress didn't intend to invoke its Commerce Clause authority to accomplish it. Again, the Supreme Court has been clear: if Congress desires to change the Constitution's federal-state balance, it must make that intent unmistakably clear.[169] Such clarity is absent here.

* * * *

Given the *Bond* Court's conclusion that § 229 doesn't reach a purely local poisoning, it didn't address the statute's constitutionality.[170] The Court here should likewise conclude that § 229 doesn't reach Morgan's purely local possession and sidestep

---

[166] *Compare* R.1 (indictment) *with* 18 U.S.C. § 229(a)(1) (listing the offense's means).
[167] *See* R.1.
[168] *See* 18 U.S.C. § 229(c)(1)–(3).
[169] *See, e.g., Bond II*, 572 U.S. at 848; *Raygor v. Regents of Univ. of Minn.*, 534 U.S. 534, 543 (2002); *Cleveland v. United States*, 531 U.S. 12, 24 (2000); *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991).
[170] *See Bond II*, 572 U.S. at 855.

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

the issue. Nevertheless, the constitutional infirmity of § 229 as applied to Morgan supplies an additional reason why the indictment must be dismissed: the Constitution's division of sovereignty reserves the prosecution of purely local activity to the States.

## IV. As applied to Morgan's constructive possession of common household cleaning agents, § 229 is void for vagueness.

Following *Bond*'s narrowing of § 229, the statute doesn't apply to any and every "toxic chemical" possessed for a non-peaceful purpose. Rather, to safeguard federalism's division of power, the *Bond* Court excluded from the statute's scope chemicals that aren't "of the sort that an ordinary person would associate with instruments of chemical warfare."[171] Again, ascertaining whether a chemical is within the law's reach depends on "the particular chemicals" that the person used, as well as "the circumstances in which" the person "used them."[172] This limiting construction is meant to stave off the Tenth Amendment problems created by applying § 229 to purely local acts—but it has opened the door to a due process problem. As applied to Morgan, and in Justice Scalia's words, "the Act, which before was merely broad, is now broad and unintelligible."[173]

The controlling standard is clear: due process demands that a crime must be defined "with sufficient definiteness that ordinary people can understand what conduct is prohibited," and "in a manner that does not encourage arbitrary and discriminatory enforcement."[174] A statute that fails to provide fair notice of what "conduct is forbidden"

---

[171] *Id.* at 861.

[172] *Id.*

[173] *Id.* at 873 (Scalia, J., concurring).

[174] *United States v. Sylla*, 790 F.3d 772, 774 (7th Cir. 2015) (cleaned up).

or "is so indefinite that it encourages arbitrary and erratic arrests and convictions" is void for vagueness.[175] Generally speaking, vagueness challenges are case-specific—"a litigant challenging the statute ordinarily must show that it is vague as applied to him."[176]

Here, as applied to Morgan' possession of household cleaning agents, the vagueness problem underlying § 229 is twofold. First, as to the "particular chemicals" he possessed, an ordinary person wouldn't associate them with the instruments of chemical warfare.[177] Both hydrochloric acid and calcium hypochlorite are legal, they're easy to buy, and they're common household cleaners. As Justice Scalia observed, the "'detergent under the kitchen sink' and 'the stain remover in the laundry room' are apparently out," and Morgan's chemicals are analogous to those household cleaning agents.[178] To be sure, when combined they make chlorine gas—but Morgan isn't charged with possessing, let alone using, that chemical. Rather, he's charged with possessing its precursors.[179] And no person of ordinary intelligence would have fair notice that he violated a law meant to curb the instruments of chemical warfare because he possessed (for *years*) common cleaning agents sold at any given Fleet Farm.

Second, as to the "circumstances in which" Morgan "used" the cleaning agents, this isn't a case where he wielded the chemicals like a weapon of war (like detonating a "homemade chlorine bomb" or spreading deadly mercury throughout a hospital).[180]

---

[175] *See, e.g., Colautti v. Franklin*, 439 U.S. 379, 390 (1979) (internal quotations omitted).
[176] *United States v. Cook*, 970 F.3d 866, 873 (7th Cir. 2020).
[177] *See Bond II*, 572 U.S. at 861.
[178] *Id.* at 873 (Scalia, J., concurring).
[179] R.1.
[180] *Fries*, 781 F.3d at 1149 (the chlorine bomb attack); *Kimber*, 777 F.3d at 556-57 (the mercury attack).

FEDERAL DEFENDER SERVICES
OF WISCONSIN, INC.

Rather, Morgan is charged with "retain[ing], own[ing], and possess[ing]" the chemical precursors.[181] Notably, that possession was constructive: he kept the cleaning agents in separate drawers in a storage unit in Whitewater, about a thirty-minute drive from his trailer in Janesville. As Justice Scalia observed in *Bond*, what "makes something a 'chemical weapon' when it is merely 'stockpile[d]' or 'possess[ed]?'"[182] Does the length of the possession matter? Does it make a difference if only precursors are at issue? "To these questions and countless others, one guess is as bad as another."[183] That unintelligibility lays bare § 229's vagueness as it applies to Morgan.

At bottom, a criminal law must provide fair notice of its scope in order to satisfy due process. As applied to cleaning supplies kept in a storage unit in a different city, § 229 "fails that test."[184] "No one should have to ponder the totality of the circumstances in order to determine whether his conduct is a felony," yet that is what the government would ask of Morgan.[185] Because § 229's "standard of conduct" as applied to him is "unintelligible," the indictment is unconstitutionally vague.[186] It must be dismissed.

[181] R.1.
[182] *Bond II*, 572 U.S. at 873 (Scalia, J., concurring).
[183] *Id.*
[184] *See id.* at 872.
[185] *See id.* at 873.
[186] *See id.*

## V.    Conclusion.

To apply § 229 to Morgan's purely local possession of common household cleaners would violate the *Bond* Court's admonition that the law doesn't reach into the cleaning cabinet. It would likewise violate the Tenth Amendment's reservation of the police power to the States; no enumerated power in Article I permits the government to regulate the possession of chemicals found in homes throughout the country. Those reasons grounded in federalism are enough to warrant dismissal, but if there's any lingering doubt the statute's vagueness dispels it. As applied to the long-term possession of common and legal cleaning agents, no person of ordinary intelligence would be on notice that they violated a law implementing a treaty meant to prevent atrocities like Verdun or the Second Battle of al-Faw. For these reasons, the indictment must be dismissed.

Dated at Madison, Wisconsin, this 19th day of July, 2024.

Respectfully submitted,

James Morgan, Defendant

*/s/ Jonathan Greenberg*
Jonathan Greenberg
Craig Albee
Matthew Giesfeldt
FEDERAL DEFENDER SERVICES
 OF WISCONSIN, INC.
22 East Mifflin Street, Suite 1000
Madison, Wisconsin 53703
Tel: 608-260-9900
Fax: 608-260-9901
jonathan_greenberg@fd.org